

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

IC
F. #2018R02187

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 15, 2025

<u>By Email and ECF</u>

The Honorable Margo K. Brodie
Chief United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Alexandru Vasile</u>
     <u>Criminal Docket No. 24-78 (MKB)</u>

Dear Chief Judge Brodie:

  The government respectfully submits this letter in anticipation of defendant Alexandru Vasile's sentencing hearing in the above-captioned case, which is scheduled for July 29, 2025. For the reasons set forth below, the government recommends that a sentence of 33 to 41 months' imprisonment, within the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range contemplated in the plea agreement, be imposed.

 I. <u>Background</u>

  A. <u>The Defendant's Conduct</u>

  The facts underlying the offense conduct in this case are set forth in the Presentence Investigation Report ("PSR") prepared by the United States Probation Department ("Probation") on July 8, 2025.

  In the summer of 2022, the defendant, along with his co-conspirators, installed "skimming" devices into ATMs, which collected information from debit and credit cards inserted into the ATM by unsuspecting victims. PSR ¶¶ 3-4. These devices included deep insert skimming devices, which are thin devices approximately twice the length of a credit card that are implanted in the ATM slot where customers insert a debit or credit card to withdraw money. <u>Id.</u> These sophisticated devices capture and store data from debit cards used by unsuspecting victims at the ATM while the skimming device is installed. <u>Id.</u> Importantly, when successful, these skimming devices do not disrupt the victims' ATM transactions, and therefore, the victims are unaware that their card data has been stolen and do not cancel their cards with their banks. <u>Id.</u>

They simultaneously installed pinhole cameras on the ATM so they could view victims inputting their corresponding personal identification numbers ("PINs"). Id. ¶ 5. More specifically, the defendant's co-conspirators fitted undetectable cameras into different parts of the ATMs, depending on the ATM model, including over the keypad or next to the keypad. Id. Those undetectable cameras recorded the victims inputting their PINs after inserting a card into the ATM. Id. Hours or days after they installed these devices, the defendants removed them from the ATM. Id.

After the defendant and his co-conspirators removed the skimming devices and cameras, they used the data captured by the skimming devices to create counterfeit cards with the corresponding PINs captured by the cameras. Id. ¶ 6. The defendants then used the counterfeit cards encoded with victim account and corresponding PINs to "cash out," or withdraw cash and make transactions. Id. To do so, the defendants would typically first attempt an account balance inquiry to determine that there was money available on the account to be withdrawn. Then, the defendants would attempt cash withdrawals from the account. As part of their scheme, the defendant and his co-conspirators possessed over 600 cards reprogrammed with stolen victim bank information.

More specifically, the defendant engaged in attempted cashouts on at least three separate occassions. On July 4, 2022, the defendant and a co-conspirator went to a Kearney Bank branch, and beginning at or around 10:39 a.m. engaged in a series of ATM transactions over the course of several minutes. See id. ¶ 7. They engaged in 14 transactions,[1] using 8 victim accounts and completed 3 transactions for a total loss amount of $2,466.00, though they attempted to withdraw more. See id. The next day, July 5, 2022, the defendant and the co-conspirator returned to the same branch at around 11:16 a.m. and engaged in an additional 10 attempted transactions successfully withdrawing $666.00.

On July 7, 2022, the defendant and two other co-conspirators went to a Capital One branch at or around 9:51 p.m., and over the course of approximately three minutes, they engaged in 74 transactions on three ATM terminals within the bank branch. See id. ¶ 7. In engaging in these transactions, the defendant and his co-conspirators used account information from 47 separate victim accounts and successfully withdrew $435.00. See id.[2]

B.  Criminal History

On March 7, 2024, the defendant and a co-conspirator were arrested in Lexington, Kentucky in connection with installing a skimming device on an ATM within a Kroger grocery store. See PSR ¶ 29. In connection with that arrest, the defendant and his co-conspirator were

---

[1] The term "transaction" is used to describe any action by the defendant and his co-conspirators using stolen account information from a counterfeit card with an ATM, which includes account balance inquiries and cash withdrawals.

[2] To the extent the PSR does not reflect the number of transactions, victim accounts and loss amounts stated in this letter, the government respectfully requests that the PSR be revised to reflec the figured stated in this letter.

2

stopped in their vehicle; in the vehicle, law enforcement agents recovered an ATM skimming device, tools required for its installation, as well as 27 bank or credit cards that had been reprogrammed with victim information, among other things. Id. The defendant subsequent pled guilty to two counts of possession of a forgery device, and was sentenced on August 16, 2024 to one year and one day imprisonment. Id.

    C.    Procedural Background

On February 21, 2024, a grand jury in the Eastern District of New York returned an indictment charging the defendant with two counts of access device fraud, in violation of 18 U.S.C. §§ 1029(a)(1), 1029(c)(1)(A)(i) (Counts Six and Eight), one count of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), 1028A(c)(4) (Count Seven) and one count of conspiring to commit bank fraud, in violation of 18 U.S.C. § 1349 (Count Sixteen). See ECF No. 76 (the "Indictment"). In September 2024, the defendant was arrested on the Indictment. Sep. 17, 2024 Minute Entry.

On April 14, 2025, the defendant pled guilty to Count Sixteen for conspiring to commit bank fraud, in violation of 18 U.S.C. §§ 1344, 1349, pursuant to a plea agreement. See Plea Agreement; Apr. 14, 2025 Minute Entry.

II.    Legal Standard

In sentencing a defendant, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which provides "the starting point and the initial benchmark" for sentencing. Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Of course, a court is not bound to impose a Guidelines sentence. See, e.g., United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (Guidelines provide the "starting point and the initial benchmark" for sentencing but are "truly advisory"). Instead, Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court also shall consider, among other things:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct; [and]
>>
>> (C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Ultimately, the sentence imposed should be "sufficient, but not greater than necessary, to comply with the purposes set forth in" subsection (a)(2), set forth above.

3

III.    Sentencing Guidelines Calculation

The applicable Guidelines, as set forth in the PSR, are as follows:

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 7 |
| Plus: Loss Amount More than $250,000 (§ 2B1.1(b)(1)(G)) | +12 |
| Plus: More than 10 Victims (§ 2B1.1(b)(2)(A)) | +2 |
| Plus: Involved Counterfeit Access Devices (§ 2B1.1(b)(11)(B)(i)) | +2 |
| Less: Acceptance of Responsibility (§ 3E1.1(a)-(b)) | -3 |
| Total: | 20 |

PSR ¶¶ 16-27.  Based on a Criminal History Category of II, an offense level of 20 carries an advisory Guidelines range of 37 to 46 months' incarceration.  Id. ¶¶ 31, 59.  The applicable Guidelines range differs from the range calculated by the parties in the Plea Agreement, which calculates a range of 33 to 41 months' incarceration based on a Criminal History Category of I.

IV.    A Term of Imprisonment of 33 to 41 Months Is Appropriate

The government respectfully submits that a term of imprisonment of 33 to 41 months' imprisonment is appropriate, and not greater than necessary to achieve the goals of sentencing, in light of all relevant sentencing factors.

The offense of conviction, using unsuspecting victims' bank account information and associated PINs to steal funds from their accounts, is serious.  That the defendant and his co-conspirators in three days used over 50 counterfeit cards to attempt cash withdrawals demonstrated that he was part of a significant ATM skimming conspiracy.  Moreover, in a mere matter of minutes, the defendant and his co-conspirators successfully stole over $3,500 from innocent victims, whose bank information they had compromised with ATM skimming devices.

The recommended sentence will also promote respect for the law.  The Court should consider that after the defendant engaged in the charged ATM skimming fraud conspiracy in New York, he continued to commit the same crime in Kentucky over a year later.  Further, there was additional skimming equipment and reprogrammed bank cards in the vehicle the defendant and his co-conspirator drove in Kentucky, suggesting their ability and plan to commit additional ATM skimming crimes when they were arrested.  The defendant's persistence in committing skimming crimes demonstrates a lack of respect for the law.

A sentence of 33 to 41 months' imprisonment would promote respect for the law and would also ensure specific and general deterrence by disincentivizing the defendant and those similarly situated from engaging in like criminal conduct.

4

V.    <u>Conclusion</u>

        For all the reasons set forth above, the government respectfully asks the Court to impose a term of imprisonment between 33 to 41 months.

                                      Respectfully submitted,

                                      JOSEPH NOCELLA, JR.
                                      United States Attorney

By:       /s/
                                      Irisa Chen
                                      Assistant U.S. Attorney
                                      (718) 254-6124

cc:    Clerk of the Court (MKB) (by ECF)
       Counsel of Record (by Email and ECF)
       U.S. Probation Officer (by Email)